UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA

CASE NOS. 19-20447-CR-SINGHAL
21-20161-CR-SIGNHAL

UNITED STATES OF AMERICA,

  vs.

BENJAMIN RAFAEL,

_____/

## BENJAMIN RAFAEL'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE

Benjamin Rafael, through counsel, respectfully submits this Sentencing Memorandum, in which he seeks to demonstrate to the Court that a reasonable sentence to address both cases would be a 30-month sentence, with 15 months to be served in custody and 15 months of home confinement, community service, and a term of supervised release.

## INTRODUCTION

There is no question that Ben has made some poor decisions in his life. At the time of the underlying case, Ben, a 25-year-old young man, was a low-ranking bank employee. He was manipulated by sophisticated criminals in this case, which led to an enormous fraud. Although the parties agree that his role in this fraud was minimal, that recognition does not adequately take into account the other § 3553 factors, which all demonstrate that a significant downward variance from the low end of the agreed upon sentencing guidelines of 63 months is warranted. As far as the second case, Ben failed to check the correct box when asked if had been

convicted of a crime on the PPP/EIDL applications. He did not falsify bank or employment records, nor in any other way did he seek to defraud the government with materially false documents. He immediately accepted responsibility, waived indictment, and pleaded guilty.

In addition to exploring these two cases in more detail, this memo will attempt to go through some of the more important § 3553 factors, which include:

- **Ben's role in the underlying offense is minimal**. Not only was he used by the much more culpable defendants. He made $60,000 in this case, compared to the tens of millions his co-defendants made. Of the long running 6-year conspiracy, his involvement was for a short, limited time of not more than six months.

- **The loss amount in both cases greatly overstates Ben's culpability**. Despite only profiting $60,000, Ben is being held accountable for the entire loss, between $25 and $60 million. Both the sentencing guidelines and the plea agreement in this case provide for a downward variance based on this overrepresentation. U.S.S.G. 2B1.1, Application Note 21(C); Benjamin Rafael Plea Agreement ¶ 12 [D.E.52]. The same is true with the PPP/EIDL case. Ben was approved for $120,000 in relief funds, but only received $28,000. Ben's case represents one of, if not the smallest loss amount prosecuted in the country for PPP/EIDL fraud, especially considering there were no aggravating factors present. Even the Guidelines recognize that there are cases where loss is not a good measure of culpability. *See* U.S.S.G. 2B1.1, n. 22(C) (explaining that "there may be cases in which the offense level determined under the guidelines substantially overstates the seriousness of the offense.")

- **Ben compares favorably to other similar cases**. Both in this District and around the country, there have been similar schemes resulting in huge losses. More culpable defendants in those cases provide a good reference point for Ben's case. For example, in the Rothstein case, two *much* more culpable co-defendants received sentences of 30 months before cooperation credit. Frank Spinosa (14-cr-60257-Bloom), a TD Bank executive who intentionally misled investors to the tune of $1.4 billion, was sentenced to 30 months. The experienced and sophisticated 54-year-old executive held a much higher position than Ben, made more money than Ben, and was much more involved than Ben. Similarly, Michael Szafranski (15-cr-60010-Dimitrouleas), who verified $200 million worth of

Rothstien's transactions and made millions of dollars received 30 months before cooperation (which was later reduced to 20 months). As for the PPP/EIDL case, unlike every other charged defendant encountered, Ben did not falsify corporate records or bank statements, lie about the number of employees, or otherwise misuse the funds for frivolous or wasteful purposes inconsistent with the CARES Act. He merely was trying to contribute to caring for his family in the worst economic conditions in the past 100 years.

- **Ben is a devoted full-time, stay-at-home dad.** His family desperately needs his continued paternal support, which allows his wife to be the sole financial provider while Ben serves as the primary caregiver for their one-year-old son. Any significant period of incarceration will detrimentally impact Ben's family and its well-being. Ben is a 31-year-old first-time, non-violent offender, who has otherwise led an exemplary life. Ben and his wife are now young parents to their first child, which will necessitate Ben's time and attention as a parent and caregiver. Even knowing about the offense, he enjoys the support of his family, friends, and professional colleagues.

- **Ben's cooperation was substantial**.  Ben immediately accepted responsibility in this case, without even seeing discovery.  He was debriefed prior to and after being charged.  He agreed to testify.  And he agreed to pay restitution in any amount that he could.

At the sentencing hearing, we will provide more detail for the Court. Below, we will outline some of these factors for the Court's consideration.

## ADDITIONAL SUPPORTING RESOURCES

In a separate filing, we provide the Court with 20 letters written by Ben's friends and family, which attest to his extraordinary character. *See* Exhibit A, *Compendium of Letters in Support of Benjamin Rafael.*

## PROCEDURAL BACKGROUND AND SENTENCING GUIDELINES

Ben pleaded guilty to Conspiracy to Commit Wire Fraud (18 U.S.C. § 1349). [D.E. 52]. The agreed upon total offense level, 25, with a criminal history category of

I, equates to an advisory sentencing guideline range of 63-78 months.[1] In the PPP/EIDL case, Ben pleaded guilty to 18 U.S.C. § 1014 and scored at a level 15, which corresponds to a guideline range of 18-24 months. [D.E. 18]. We have moved to consolidate these cases for sentencing.

## DOWNWARD VARIANCE

We respectfully urge the Court to vary below the advisory guideline range and impose a sentence of 30 months incarceration, with 15 months to be served in custody and 15 months to be served in home confinement, as well as community service, and a term of supervised release, which is sufficient – but not greater than necessary – to satisfy the factors outlined in 18 U.S.C. § 3553(a). *See Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

## I.   THE NATURE AND CIRCUMSTANCES OF THE OFFENSE
### A. Ben's Role in the Underlying Offense is Minimal

It is of critical importance to note that Ben did not start out as a member of this conspiracy, which was in operation for years before Ben was recruited. Ben's entire involvement in this case was for approximately ***four months*** in 2015. With an official job title of Personal Banker, Ben was one position above bank teller. At the time of the offense, he had only been working at the bank for a few months. His day-to-day duties involved opening and closing personal and business accounts, sending wire transfers, drawing cashier's checks, and otherwise fulfilling

---

[1] This is the guideline range assuming that Ben receives credit for acceptance of responsibility. We understand that the government has not yet taken a position on whether it will agree to acceptance of responsibility in light of Ben's second case. We filed an objection concerning this issue.

ministerial duties. Ben did not have the power to access Wells Fargo's brokerage accounts, which were for high-dollar account holders.

In early 2015, by shear bad luck, Ben happened to be the person available to help Mr. McConley open several personal and business accounts at the time he walked into the Brickell Wells Fargo branch. Over the next couple months, Mr. McConley would come by the branch on a daily basis, sometimes multiple times in one day, to have Ben send wires, confirm wires were received and deposit checks. Through these almost daily interactions, Ben and Mr. McConley became well acquainted, and soon were friends. What is more, Mr. McConley began to treat Ben to expensive lunches, dinners, happy hours and generally exposed him to a world of luxury and wealth he had never experienced before. Ben was in awe, to say the least. In late February 2015, Mr. McConley invited Ben, his wife, and some other individuals to fly aboard a private jet to enjoy the weekend in Las Vegas as his guests—Mr. McConley reportedly even flew the plane himself.

Ben recalls that it was right around the date of this trip that Mr. McConley and his partner Mr. Van Eman began to ask more of Ben than was legal. The favors first started out small, i.e., to confirm a wire transfer that was in actuality not yet completed. But over the course of the next few months, until late June of 2015, the requests became more substantial and came to include lies on Wells Fargo letterhead and via his employee email.

McConley and Van Eman knew Ben was inexperienced and unsophisticated, so they ensured they obtained what they needed from him by sending verbatim

what they wanted written, or already had their own letter prepared for Ben to sign or send from his Wells Fargo email account. Once Ben was fired from Wells Fargo in June of 2015, he held very limited utility for his co-conspirators as he could no longer send official Wells Fargo emails. Accordingly, they continued the conspiracy in a different direction without his involvement.

For his participation in the conspiracy, co-defendants Jason Van Eman and Ben McConley paid Ben $60,000, a microscopic drop in the bucket when compared to the loss amount Ben has accepted. In fact, it represents only 1% of the total fraud. There was never a *quid-pro-quo* arrangement wherein Ben agreed to sign a letter or send an email in exchange for a particular payment. Rather, Ben, in his youthful naiveté, indulged these requests by his co-defendants because he was impressed with their apparent success and wanted to find an inroad to the same. Unfortunately, by the time Ben saw the error of his ways, it was too late, and he was in too deep.

Regarding the PPP/EIDL loan applications, we would like to underscore that Ben did not doctor or otherwise alter his supporting application documents. Almost universally, PPP/EIDL prosecutions involve aggravating factors absent here, including but limited to: fraudulently stating the number of employees or payroll amounts; submitting phony bank statements; submitting fake tax documents; creating bogus or use of defunct companies; or using stolen identities or aliases. The preceding factors are the standard hallmarks of PPP/EIDL fraud cases. Ben's only crime here is checking 'no' on the box asking whether he had been arrested. Not

only are there no aggravating factors present, Ben's loss amount reflects the lowest prosecution to date—that we could find.

Although PPP/EIDL prosecutions are a fairly recent phenomenon, there have been numerous sentencings of late, which the Court may find illustrative. As mentioned above, research did not elicit a single PPP/EIDL prosecution involving a lower loss amount. Loss amounts in these cases typically range from a few hundred thousand dollars to many, many millions.

For example, out of Virginia, defendant Monika Jaworska[2] pleaded guilty to an 18 U.S.C. § 371 count and agreed with the government that she defrauded victims of ***at least*** $1,448,500 dollars. [D.E. 91]. Per her stipulated proffer, she and a related defendant submitted fraudulent PPP loan applications for four separate businesses wherein they made materially false representations as to: the number of employees employed by the businesses; payroll of the businesses; business addresses; employment taxes paid; purpose of the sought funds; and false tax returns. In total, 14 fraudulent loan applications were filed seeking over $6.5 million dollars. *Id*. $1,438,000 was actually disbursed by the victim banks. Judge Hilton sentenced Ms. Jaworska to time served (3 months incarceration) and ordered she repay $220,573 in restitution. With respect to her co-conspirator, Tarik Jaafar,[3] Judge Hamilton sentenced Mr. Jaafar to 12 months imprisonment and ordered he repay $220,573 in restitution.

---

[2] 20-cr-180 E. Dist. VA
[3] 20-cr-185 E. Dist. VA

In the case of *United States v. Robert Hamilton*, 20-CR-196, E.D. Wis., Mr. Hamilton acknowledged that he allowed a co-conspirator to fraudulently inflate his company's payroll on a PPP loan application to $62,000 per month. [D.E. 38]. The application also contained fraudulent tax information. As a result of these fraudulent misrepresentations, Mr. Hamilton and his co-conspirators caused the victim bank to disburse $155,000 dollars to his company, which is five times the amount Ben received. Judge Ludwig sentenced Mr. Hamilton to six months imprisonment and ordered restitution in the amount of $155,000. Mr. Hamilton's co-defendant, Samuel Davis, also received six months imprisonment.

The preceding cases reflect some of the lowest loss amounts for PPP/EIDL prosecutions, which far overshadow Ben's intended loss amount, and his actual loss of $28,000. All the preceding cases involve fraudulent documents that overstated employees, payroll, and taxes. Ben did not do any of those things.

### B. The Loss Amount in Both Cases Greatly Overstates Ben's Culpability

We move the Court for a downward departure, pursuant to U.S.S.G. § 2B1.1, Application Note 21(C), which states, "[t]here may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted."

The Ninth Circuit in *United States v. Edwards*, 595 F.3d 1004, 1010, 1018 (9th Cir. 2010), upheld a probationary sentence far below the guideline range as substantively reasonable in a bankruptcy fraud case where the sentencing judge stated that the guideline range calculated using intended loss "overstated the

circumstances" of the defendant's case, despite having a prior conviction for making false statements to Arizona financial institutions.

Just like in *Edwards*, the loss amount ***significantly*** overstates Ben's culpability in this case and a downward departure pursuant to U.S.S.G. § 2B1.1, Application Note 21(C), is appropriate because it was co-defendant Jason Van Eman who drafted the fraudulent bank letters to victims. Ben simply "copied and pasted" the language Van Eman directed him to use and forwarded the letters along. At times, Ben's contribution to the conspiracy consisted of little more than an e-mail stating, "I confirm" following various misrepresentations to investors by Van Eman and McConley. In short, he was at the bottom of the pyramid in terms of planning, direction, knowledge, understanding, profit, and conduct. Unlike the leaders, he did not devise this scheme, run the fraud, or otherwise assert any decision-making authority. Because he lacked knowledge of the entire scope for the conspiracy and profited close to nothing (unlike his co-conspirators), he is plainly the least culpable of those involved in this case. The conspiracy existed long before Ben's involvement and continued long after his withdrawal. It is also worth highlighting that in many ways, Ben (a 25-year-old, young and unsophisticated entry-level employee), was used by the much more sophisticated criminals in this case. These are all facts which demonstrate Ben not only deserves a 4-level minimal participant adjustment under U.S.S.G. § 3B1.2, comment. (n.3(A)), but also a departure under U.S.S.G. § 2B1.1

Application Note 21(C) of U.S.S.G. § 2B1.1 is also applicable to the PPP/EIDL case. To reiterate, Ben never sought a specific amount of money; he submitted an application with real and accurate numbers, and the government system generated a loan approval amount. The number generated by the computer program is what the government considers to be intended loss. In actuality, Ben obviously could not have intended a loss of that amount because the government algorithm generated the amount after he input his real numbers. While we sought to limit the scope of loss to the amount disbursed to Ben (actual loss), the government insisted he accept responsibility for the higher loss amount, which he did.

Although Ben acquiesced this request, we think it appropriate the Court take into account how loss in this case was calculated. Just like in the *Edwards* case discussed above, the loss amount in the PPP/EIDL case ***significantly*** overstates Ben's culpability and a downward departure pursuant to U.S.S.G. 2B1.1, Application Note 21(C), is warranted.

Although the PPP/EIDL case occurred during the pendency of the underlying case, we again place those facts into context. As a record small business owner, Ben was bombarded by bank representatives inviting him to apply for PPP/EIDL relief funds. Being without consistent work and having recently had a baby, Ben thoughtlessly applied. The impact from his involvement in the criminal case on the PPP/EIDL loan application was not apparent to Ben on its face; he simply checked the electronic boxes and submitted his bank and incorporation records. Based upon the information he provided—which was all true and correct save for arrest

history—the algorithm generated a loan amount. Ben did not request a specific amount of money. The decision of how much of a loan to approve was entirely based on his financial statement. And while the automated system approved Ben for a total of $121,500 dollars between six loans, he only received $28,000 dollars. In fact, Ben rejected receiving more money despite being approved for it. As a struggling full-time parent, Ben simply thought he was taking part in a government program that would help his family get through the toughest economic conditions of the past century.

## II.    BEN COMPARES FAVORABLY TO OTHER SIMILAR CASES

There are similar cases worth comparing to this matter.  For example, Frank Spinosa, a defendant sentenced in the infamous Scott Rothstein case, which involved a $1.5 billion dollar Ponzi scheme fraud. Mr. Spinosa was a Vice President for TD Bank, and in that capacity, he worked with Rothstein to send letters to investors to assure them that funds were available at the bank. *See Spinosa Factual Proffer,* p. 3, ¶ 3.  Mr. Spinosa also attended meetings with investors as Mr. Rothstein's banker, where he assuaged investor concerns and reassured them that Mr. Rothstein was in good standing with the bank. *Id*. Spinosa was much more senior (and sophisticated) than Ben and the fraud was much more far-reaching. Spinosa was sentenced to 30 months imprisonment. Both in terms of role due to banking title and the scope of the fraud, Mr. Spinosa deserved significantly more punishment than Ben, a lowly personal banker who could not even check brokerage account balances.

An additional comparable defendant is that of Michael Szafranski, another Rothstein case (15-cr-60010-Dimitrouleas). According to his factual proffer [D.E. 46], Mr. Szafranski was a registered investment advisor who operated a purportedly independent third-party verifier for transactions involving multiple Scott Rothstein investors, when in fact, Mr. Szafranski was getting kickbacks and commissions for recruiting investors instead of operating as an independent fiduciary. *See Szafranski Factual Proffer,* p. 2-3. He was responsible for $6.5 million in restitution. *See Szafranski Sent. Memo,* p. 2. For his role in the Rothstein fraud (he did not receive a minor role adjustment), Mr. Szafranski was sentenced to 30 months by Judge Dimitrouleas, which he later reduced to 20 months for cooperation. The fact that Mr. Szafranski was a third-party fiduciary who operated his own company, profited millions of dollars from the fraud, and was certainly not a minimal participant in the conspiracy, clearly reflects the need for greater punishment than does Ben—a lowly bank employee who made a maximum of $60,000.00 during the course of his involvement in the conspiracy.

Although the preceding two cases are some of the leading comparables from within the district, they are by no means the only cases when looking at a national level. For example, Kareem Serageldin, a former Credit Suisse Managing Director, was sentenced to 30 months imprisonment for his involvement in a scheme to conceal over $100 million dollars in losses, which stemmed from his company's

investment in subprime mortgage-backed securities. *See DoJ Press Release.*[4] After pleading guilty to a conspiracy to commit wire fraud and falsify records, Serageldin was sentenced to 30 months imprisonment and ordered to pay a $150,000.00 fine.

In *United States v. Beth Zastawny*, 19-cr-30019, defendant Zastawny received a term of probation, with the first year to be served in home confinement, in a bank fraud and money laundering case out of the District of Massachusetts. Ms. Zastawny stipulated to over $4.2 million in loss caused to Blue Hills Bank in 2015 from her fraudulent misrepresentation of her assets and accounts receivable. *See Zastawny Info.,* p. 1-2. [D.E. 1]. When Ms. Zastawany's business began to fail, she opted to obtain bank loans through fraudulent means. *Id*.

Similarly, in the case of *United States v. Tae Kim*[5], Kim, a former Citibank and WSFS Bank loan officer, admitted to submitting false information about a client's available deposits at Citibank in connection with a loan application at another bank; and, falsifying the scope of a client's liabilities in connection with a loan at WSFS Bank. *See Tae USAO Release.*[6] Just like Ben, defendant Tae agreed to forfeit $60,000.00 in a money judgement. *See Tae Plea,* p. 4. [D.E. 5]. For his role in the bank fraud conspiracy, Judge Richard Andrews sentenced Tae to 18 months imprisonment and ordered over $3.2 million dollars in restitution.

---

[4] https://www.justice.gov/usao-sdny/pr/former-credit-suisse-managing-director-sentenced-manhattan-federal-court-30-months
[5] *United States v. Tae Kim*, 17-cr-42, D. Del.
[6] https://www.justice.gov/usao-de/pr/former-banker-sentenced-18-months-federal-prison-fraud

The next example illustrates that, even in cases where a bank employee is caught accessing and pilfering accounts at the bank where the defendant was employed, a nonincarcerative sentence has still been found to be appropriate. Reuben Thompson-Quartey[7] was an employee at Beneficial Bank in Pennsylvania that used his position of trust to access confidential account information and means of customer identification. *See Thompson-Quartey Info.,* p. 1-2. [D.E. 1]. Mr. Thompson-Quartey then sold that unique and confidential information to co-conspirators, who then took the confidential customer data and created false drivers' licenses in the names of true account holders to surreptitiously withdraw funds from victim accounts. *Id*. Over the course of the one-year conspiracy in 2016, Mr. Thompson-Quartey and his co-conspirators stole hundreds of thousands of dollars from victims. For his role in stealing confidential customer data and selling it to co-conspirators knowing they would be victimized, Judge Harvey Bartle, III sentenced Mr. Thompson-Quartey to six months home confinement, 100 hours of community service, and $299,000 in restitution. *See Thompson-Quartey J&C*, p. 5-6. [D.E. 23].

In a set of facts not too dissimilar from *Thompson-Quartey* is the case of *United States v. Timothy McMillian*, 19-cr-128, N. D. Ala. There, defendant McMillian, a Regions Bank employee, fraudulently accessed Regions Bank customer profiles and shared their social security number and other identifying information with co-conspirators, who later then assumed Regions Bank victim identities and

---

[7] *United States v. Reuben Thompson-Quartey*, 18-cr-436, E. D. Pa.

withdrew hundreds of thousands of dollars from four different victim accounts. *See McMillian Plea,* p. 2-4. [D.E. 3]. Judge Abdul Kallon sentenced Mr. McMillian to 24 months imprisonment.

In the case of *United States v. Jennal Aziz*, 18-cr-226, S. Dist. Ga., Ms. Aziz, a bank manager, pled guilty to accessing "Bank A's" confidential customer account information so that a co-conspirator, who was not a bank affiliate, would direct-solicit salient individuals for a fraudulent investment scheme. *See Aziz Plea,* p. 2. [D.E. 29]. For her role in this conspiracy, Ms. Aziz was sentenced to six months imprisonment.

Just last month in *United States v. Hamid Akhavan*, 20-cr-188, S. Dist. Ny, Judge Rakoff sentenced Mr. Akhavan to just 2.5 years ***after*** being convicted at trial and even violating the terms of his pretrial release. Mr. Akhavan was one of the leaders of a bank fraud scheme wherein he and his co-conspirators lied to banks about the nature of their business, which was the marijuana trade. According to the government's sentencing memo, co-conspirators testified that Mr. Akhavan was "uniformly identified [] as the leader of the Scheme throughout the relevant time period." [D.E. 318]. What is more, for his involvement as a leader of a more than $150 million dollar bank fraud conspiracy that generated Mr. Akhavan nearly $8.5 million dollars, Judge Rakoff found 30 months incarceration to be sufficient, but not more than necessary to provide appropriate punishment.

Here, a sentence of not more than 30 months imprisonment, served half in-half out, is warranted in light of the sentences imposed in the highlighted cases

above, particularly in the context of TD Bank Vice President Frank Spinosa and third-party fiduciary verifier Michael Szafranski, in order to avoid unwarranted sentencing disparities within the District. In zeroing-in on Ben's criminal conduct, it amounts to sending emails or signing letters his co-defendants prepared for him, which is significantly lesser on the scale of *mens rea* culpability than that of the conduct associated with the defendants in the preceding discussion. Ben is far less culpable than ***all*** of the above-described defendants, both in this District and others and, accordingly, he deserves a sentence consistent with those imposed in the more egregious cases perpetrated by more culpable individuals.

### III.   BEN IS A DEVOTED FULL-TIME, STAY-AT-HOME DAD

Congress has directed that a defendant's personal characteristics should be considered ***equally*** with "the nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). Yet these factors are given no weight in the guidelines calculation; indeed, the guidelines recognize only the defendant's criminal record (providing for higher offense levels for a greater criminal history, rather than reductions for no prior record). *See Rita v. United States*, 551 U.S. 338, 364-65 (2007) ("The Commission has not developed any standards or recommendations that affect sentencing ranges for many individual characteristics. Matters such as age, education, mental or emotional condition, medical condition (including drug or alcohol addiction), employment history, lack of guidance as a youth, family ties, or military, civil, charitable, or public service are…matters that § 3553(a) authorizes the sentencing judge to consider."). *See also United States v. Martin*, 520 F.3d 87, 93

(1st Cir. 2008) (affirming a 91-month variance down from the guideline range based in part on "the support that the defendant stood to receive from his family [and] personal qualities indicating his potential for rehabilitation"). Therefore, we urge the Court to balance the guidelines calculations by giving fair and due consideration to the many characteristics that weigh heavily in favor of sentencing Ben to a 30-month split sentence.

Ben was born in Los Angeles, California, into an Iranian-Jewish family. For the first eight years of his life, Ben lived together with his parents and sister. At age eight, his parents separated, and his father moved to El Paso, Texas. At first, Ben stayed with his mother and in sister in LA, but with his mother's responsibilities exceeding her capacity to provide, the decision was made to send Ben to live with his father at age twelve. During the period of Ben's parents separating, his mother was caring for her two children, her sister, and their mother, which was more than she could handle.

At twelve in El Paso, Ben found it rough assimilating into the new system, with being bullied a prevalent memory of those formative years. Apart from being of short stature, Ben particularly struggled with his family heritage. Kids chided him before being of Middle Eastern descent, something particularly difficult in the wake of 9/11, and for being Jewish. Antisemitism was a constant reminder to Ben that much of his classmates did not like him for something beyond his control; and this weighed heavily on his heart. While in El Paso, Ben largely was left to fend for himself as his father owned and operated a small retail clothing store in a strip

mall. The store always struggled financially, but Ben's father did his best to run the business and would open and close the store every day. The rigors of small business ownership did not leave an abundance of time for Ben and his father to share together.

Upon graduation from high school, Ben decided to leave Texas for South Florida, where he had earned a merit-based scholarship to Johnson & Whales University, in North Miami. Ben not only maintained his academic scholarship, but excelled in his studies, earning Dean's list recognition every semester until his graduation from college with a bachelor's degree in Business Administration.

During college, Ben started working an entry-level job at a hotel on Miami Beach, where after four years he rose to the position of concierge. Wanting to find employment in his field of study, Ben applied and was hired for an hourly wage position, personal banker, with Wells Fargo Bank in late 2014.

Not long after Ben began working at Wells Fargo, his mother began having consistent and severe abdominal pain, which doctors in California concluded required a routine gallstone surgery. Unfortunately, however, during the procedure Ben's mother suffered a reaction to anesthesia and would not resuscitate the day following surgery. In response, doctors administered another drug to counteract the anesthesia, which had the effect of giving Ben's mother a heart attack. Ben arrived from Miami just in time to be at his mother's side before she tragically passed for what was supposed to be a routine and simple procedure.

When the related civil case began to pick up steam in 2016-17, Ben began to suffer physical symptoms from anxiety and stress associated with the overwhelming toll of litigation. Ben began to form welts and hives on his skin, which doctors attributed to stress and anxiety. Things became so severe doctors even recommended a surgery to remove some nerve endings in his lower back through his tailbone. Ultimately, Ben declined to do the surgery and self-medicated through alcohol abuse. As the civil and criminal probe advanced, Ben did his best to manage his stress as best he could, which frequently amounted to Ben not leaving the house and drinking alcohol in despair while lamenting his prior conduct and the lasting consequences those actions yielded. Ben has suffered a tremendous personal cost in grief and angst. There is not one day that has gone by that Ben does not regret his actions and the harm it enabled others to perpetrate the crime.

Because of his ongoing criminal case, finding stable work would be a difficult task in normal times. But with the added economic hardship stemming from a global pandemic, work has simply been impossible for Ben to find. So, while Ben's devoted, hard-working wife spends her nights in the pediatric wing of a local hospital to financially support their young family, Ben has assumed the role of primary care provider for their infant son. He prepares and provides his son's food, changes diapers, reads, teaches, and otherwise does everything within his reach to be the best full-time dad he can be. If Ben were sentenced to a significant period of incarceration, there would undoubtedly be deleterious effects on his son's wellbeing as well as the Rafael family as a whole.



Children in their early childhood (from ages two to seven) may also suffer from parent-child separation as well as the trauma of experiencing parental criminal activity and arrest, while children in their middle childhood (from ages eight to eleven) may experience low self-esteem or poor self-concept as they struggle in developing a sense of autonomy and individuality. Adolescent children may display an increased level of aggression or maladaptive coping mechanisms which could eventually lead to school dropout, delinquency, or adult crime.[8] *See also: United States v. Dominguez*, 296 F.3d 192 (3d Cir. 2002) (district court erred in concluding it could not depart four levels in bank fraud case for defendant who resided with elderly parents, who were physically and financially dependent on her); *United States v. Davis*, 2008 WL 2329290 (S.D.N.Y. June 5, 2008) (court imposed time-served on a first time offender devoted to the education of the six children of his 15 year marriage – and the judge believed incarceration would deny the children the "care and guidance clearly needed at this point in their lives"); and *United States v. Crawford*, 2007 WL 2436746 (E.D. Wis. Aug. 22, 2007) (district

---

[8] *Maternal Incarceration and Children's Long-Term Outcomes: Timing versus Dosage?* Rosa M. Cho, Brown University.

court granted a variance from the Guidelines due in part to the defendant's family situation with five children and the impact incarceration would have on the children).

There is no question that the prospect of Ben being away from his child and family for any length of time is more severe a punishment than any term of incarceration would amount to.

## IV.    BEN'S COOPERATION WAS SUBSTANTIAL

We will address this more at sentencing, but as an overview, Ben:

> • Participated in debriefings with the Government for hours at a time to answer questions, share information, and examine documents;

> • Spent hours prior to each debriefing to sufficiently prepare, gather documents, and refresh recollection; and

> • Is available to testify in the trial of Jason Van Eman.

We understand that Ben's second case is an issue here, but we still believe his cooperation can and should be considered by the Court. While it was expected that as a result of Ben's efforts, the government would move, pursuant to Fed. R. Crim. P. R35(b), for a reduction of Ben's sentence as soon as his cooperation was complete in the trial of Jason Van Eman. But because of the PPP/EIDL case, the government is now mum on whether it still plans to use Ben in the Van Eman trial.

The Court may, of course, consider the government's proposal; but the ultimate sentence to be imposed remains within the sole discretion of the Court, which may consider a defendant's efforts towards cooperation. *See United States v. Landron-Class*, 696 F.3d 62 (1st Cir. 2012). The Court can also look to the research

and statistics of the U.S. Sentencing Commission with regard to cases involving cooperation. In the fiscal years 2008 through 2014, the median percent decrease from the *bottom* of the guidelines in fraud cases was over 70%.[9] Applying that metric to Ben's case would qualify him for a split sentence, even before variance arguments.

Ben's acceptance of responsibility, his personal characteristics, the support he has from his family and in the community, his desire never again to be in a position where he could be separated from his family, his willingness to cooperate and the other factors discussed above, demonstrate he deserves a sentence of not more than 30 months, to be served as a split sentence, for his involvement in both cases.

## CONCLUSION

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate ... the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Here, Benjamin Rafael admittedly committed the crimes of conspiracy to commit wire and bank fraud. He does not seek to justify, minimize, or explain away these actions. He knows they were wrong.

---

[9] http://www.ussc.gov/Research_and_Statistics/Annual_Reports_and_Sourcebooks/2012/sbtoc12.htm and
http://www.ussc.gov/Research_and_Statistics/Annual_Reports_and_Sourcebooks/Archives.cfm

We respectfully request that this Court sentence Ben Rafael to a total term of 30 months, to be served half in custody and the other half on home confinement, along with community service, and a term of supervised release.

Respectfully submitted,

**MARKUS/MOSS PLLC**
40 N.W. Third Street, PH1
Miami, Florida 33128
Tel: (305) 379-6667
Fax: (305) 379-6668
markuslaw.com

By:   /s/ David Oscar Markus
      David Oscar Markus
      Florida Bar Number 119318
      dmarkus@markuslaw.com


      /s/ Todd C. Yoder
      Todd C. Yoder
      Florida Bar Number 71263
      tyoder@markuslaw.com