UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 19-20447-CR-SINGHAL
Case No. 21-20161-CR-SINGHAL

UNITED STATES OF AMERICA

vs.

BENJAMIN RAFAEL,

    Defendant.
_____/

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR
DOWNWARD VARIANCE AND SENTENCING MEMORANDUM**

The United States of America hereby responds to Defendant Benjamin Rafael's Motion for Downward Variance and Sentencing Memorandum ([ECF No. 26]). Defendant's crimes speak for themselves. He participated throughout 2015 in a massive Ponzi scheme by lying to victim investors about the security of their money. As a banker at one of the largest financial institutions in the country, he was in a unique position to do so. Defendant's involvement, however brief, enabled the theft of well over $30 million from numerous investors. Five years later, as his sentencing date approached, Defendant once again resorted to fraud. Between April and May of 2020, he repeatedly lied about his criminal history in order to secure COVID-19 loans from various banks and Federal agencies.

The Government generally agrees with the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), as calculated by the Probation Office in the Presentence Investigation Reports ("PSI[s]"), but respectfully recommends: (1) a four-level reduction based on Defendant's role in the Ponzi scheme offense, pursuant to U.S.S.G. § 3B1.2(a); and (2) a two-level reduction for Defendant's acceptance of responsibility in that case, pursuant to U.S.S.G. §

3E1.1(a). Given Defendant's conduct in both cases, however, his extraordinary request for leniency should be denied.

## INTRODUCTION

### The Ponzi Scheme Case

In Case No. 19-20447, Defendant assured investors that their money was securely deposited in certain Wells Fargo Bank accounts (Def. Factual Basis [ECF No. 53] at ¶ 12). In truth, he was helping his co-conspirators steal it (id.). Defendant's employment at the bank was critical to the scheme's success (see PSI [ECF No. 130] ¶ 32). In the first half of 2015, Defendant interacted directly with numerous victims, including those identified in the indictment as "C.K.," "T.L.," "C.T.," and "G.S." (see PSI at 18-21). Together, those victims invested well over $32 million based on Defendant's assurances "that their contributions or loans had been 'matched' and that McConley and Van Eman had applied for lines of credit as promised in the funding agreements" (Def. Factual Basis at ¶ 12).

Even after he was fired by the bank in June 2015, Defendant (1) pretended he was still a Wells Fargo banker and (2) continued to lie to victims about their money. For example, in October, he signed a bogus letter (using his Wells Fargo signature block) promising victims that their account "has a current balance of $30,021,391" (PSI at 21; Def. Factual Basis at ¶¶ 13, 15-16). Unfortunately for those victims, that account did not exist and their money, approximately $28.6 million worth, was already gone (PSI ¶ 35). A portion of it went into the bank account Defendant and McConley jointly controlled in the name of "Capital B LLC," which Defendant used to buy real estate and pay off his large credit card bills (Def. Factual Basis at ¶ 13, 16; PSI Add. [ECF No. 130-1] at 5).

Accordingly, Defendant's Guidelines in Case No. 19-20447 are driven by a conservative, estimated loss amount of between $25 million and $65 million. See U.S.S.G. § 2Bl.l(b)(1)(L). The Government's Guidelines calculation in that case follows.

**Case No. 19-20447 Guidelines**

| | |
|---|---|
| Base Offense Level (§ 2B1.1(a)(1)) | 7 |
| Actual loss > $25 million (§ 2B1.1(b)(1)(L)) | +22 |
| Number of victims > 10 (§ 2B1.1(b)(2)(A)(i)) | +2 |
| Sophisticated means (§ 2B1.1(b)(10)(C)) | +2 |
| Mitigating role (§ 3B1.2(a)) | -4 |
| Acceptance of responsibility (§ 3E1.1(a)) | -2 |
| **TOTAL OFFENSE LEVEL** | **27** |

Defendant's Guidelines range in Case No. 19-20447 is therefore **70-87** months' imprisonment. As noted, the Government will recommend a two-level reduction based on Defendant's acceptance of responsibility in that case, but will not file a motion requesting a "third point" under Section 3E1.1(b) of the Guidelines. See id., App N. 4. The Probation Office maintains that Defendant should receive **no** reduction for pleading guilty in Case No. 19-20447 (PSI ¶ 107), and a three (rather than a four) level reduction based on his role (PSI ¶ 103). That calculation results in a range of **97-121** months' imprisonment. Despite his new crimes, Defendant claims he is entitled to full credit for acceptance of responsibility and a four-level reduction based on role (see generally Def. PSI Obj. [ECF Nos. 129, 124]).

**The Bank Fraud Case**

Between April and May 2020, while he was free on bond and awaiting sentencing in Case No. 19-20447, Defendant submitted six (6) applications for COVID-19 loans meant to help struggling business owners survive the pandemic (see PSI, Case No. 21-20161 [ECF No. 25] at ¶

20).[1] In those applications, Defendant denied that he previously pled guilty (and was adjudged guilty by Judge Ungaro), knowing full well that a truthful answer would disqualify him (id.). Defendant subsequently pled guilty in Case No. 21-20161 to the charge of knowingly making false statements to a financial institution, in violation of 18 U.S.C. § 1014. Defendant's Guidelines in that case are undisputed (see Def. PSI Obj., Case No. 21-20161 [ECF No. 24] at 1):

**Case No. 21-20161 Guidelines**

| | |
|---|---|
| Base Offense Level (§ 2B1.1(a)(1)) | 7 |
| Intended loss > $95,000 (§ 2B1.1(b)(1)(E)) | +8 |
| Obstruction of justice (§ 3C1.3) | +3 |
| Acceptance of responsibility (§ 3E1.1(a)-(b)) | -3 |
| **TOTAL OFFENSE LEVEL** | **15** |

Accordingly, Defendant's Guidelines range in Case No. 21-20161 is **18-24** months' imprisonment; or, if the sentence in Case No. 19-20447 is imposed first, Defendant's Criminal History Category would become "II" and his Guidelines range would be **21-27** months. See U.S.S.G. § 4A1.1(a).

## SUMMARY OF THE GUIDELINES CACULATIONS

Below is a summary of the Guidelines, as calculated by the Probation Office, the Government, and Defendant:

**The Ponzi Scheme Case**

| Applicable Guideline | PSI | Government | Defendant |
|---|---|---|---|
| Base Offense Level | 7 (2B1.1(a)(2)) | 7 (2B1.1(a)(2)) | 7 (2B1.1(a)(2)) |

---

[1] References to docket entries in the bank fraud case will include the case number, 21-20161. References to docket entries in Defendant's Ponzi scheme case will not.

| | | | |
|---|---|---|---|
| Loss | 22<br>(2B1.1(b)(1)(L))<br>(Over $25,000,000) | 22<br>(2B1.1(b)(1)(L))<br>(Over $25,000,000) | 22<br>(2B1.1(b)(1)(L))<br>(Over $25,000,000) |
| Sophisticated Means | 2<br>(2B1.1(b)(10)(C)) | 2<br>(2B1.1(b)(10)(C)) | 2<br>(2B1.1(b)(10)(C)) |
| 10 or More Victims | 2<br>(2B1.1(b)(2)(A)(i)) | 2<br>(2B1.1(b)(2)(A)(i)) | 2<br>(2B1.1(b)(2)(A)(i)) |
| Mitigating Role | -3<br>(3B1.2(a)) | -4<br>(3B1.2(a)) | -4<br>(3B1.2(a)) |
| Acceptance | — | -2<br>(3E1.1(a)) | -3<br>(3E1.1(a)-(b)) |
| Offense Level | **30<br>(97-121 Months)** | **27<br>(70-87 Months)** | **26<br>(63-78 Months)** |

**The Bank Fraud Case**

| Applicable Guideline | PSI | Government | Defendant |
|---|---|---|---|
| Base Offense Level | 7<br>(2B1.1(a)(2)) | 7<br>(2B1.1(a)(2)) | 7<br>(2B1.1(a)(2)) |
| Loss | 8<br>(2B1.1(b)(1)(E))<br>(Over $95,000) | 8<br>(2B1.1(b)(1)(E))<br>(Over $95,000) | 8<br>(2B1.1(b)(1)(E))<br>(Over $95,000) |
| Obstruction of Justice | 3<br>(3C1.3) | 3<br>(3C1.3) | 3<br>(3C1.3) |
| Acceptance | -3<br>(3E1.1) | -3<br>(3E1.1) | -3<br>(3E1.1) |
| Offense Level | **15<br>(18-24/ 21-27 Months)** | **15<br>(18-24/ 21-27 Months)** | **15<br>(18-24/ 21-27 Months)** |

### GOVERNMENT'S SENTENCING RECOMMENDATION

In light of Defendant's conduct in 2015 and 2020, the Government recommends a sentence of **78 months' imprisonment**, in Case No. 19-20447, and a sentence of **18 months' imprisonment**, in Case No. 21-20161, with at least **six months of the latter to run consecutive**

**to the former**.[2]  As a result, in total, the Government recommends that Defendant **serve a total of 84 months** for the Ponzi scheme case and the bank fraud case. That sentence, which includes adjustments for acceptance of responsibility and role, accounts for the Defendant's comparative involvement and eventual acceptance of responsibility. More importantly, it reflects both (1) the enormous harm caused by Defendant's conduct while employed as a banker; and (2) the brazenness of his subsequent crimes, namely, obtaining disaster relief funds through bank fraud. In short, a prison sentence around seven years holds Defendant accountable for his actions. His proposal, a 30-month "private prison" accommodation, does not come close.

## SENTENCING PRINCIPLES
## 18 U.S.C. § 3553(a)

After United States v. Booker, 543 U.S. 220 (2005), a sentencing court need only consider the factors in 18 U.S.C. § 3553(a) and determine a reasonable sentence. United States v. Talley, 431 F.3d 784, 786 (11th Cir. 2005). We address the relevant factors below. While the Court must consider all the relevant factors, it "need only acknowledge that it considered [them], and need not discuss each of these factors in either the sentencing hearing or in the sentencing order." United States v. Amedeo, 487 F.3d 823, 833 (11th Cir. 2007). The Court may give greater weight to some factors than others. See United States v. Shaw, 560 F.3d 1230, 1238 (11th Cir. 2009).

---

[2] As noted in the PSI, because the Defendant committed a crime while free on bond, the Court shall impose a consecutive sentence in the bank fraud case, pursuant to 18 U.S.C. § 3147 (PSI, Case No. 21-20161, [ECF No. 25] at ¶ 82). See also United States v. Brimm, 608 F. App'x 795, 801 n.9 (11th Cir. 2015) (discussing Section 3147).

### Punishment for White-Collar Criminals

The Eleventh Circuit has said "economic and fraud-based crimes" are "more rational, cool, and calculated than sudden crimes of passion or opportunity," and thus "prime candidate[s] for general deterrence." United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker*, 47 Wm. & Mary L.Rev. 721, 724 (2005)). Indeed, the legislative history of Section 3553 shows Congress recognized "the critical deterrent value of imprisoning serious white collar criminals, even where those criminals might themselves be unlikely to commit another offense[.]" Martin, 455 F.3d at 1240 (citing S. Rep. No. 98-225, at 76, 91-92 (1983)). The Eleventh Circuit also observed that "[d]efendants in white collar crimes **often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment**." Martin, 455 F.3d at 1240 (emphasis added).

### THE STATUTORY FACTORS

The relevant Section 3553(a) factors are discussed below. In broad strokes, these factors compel the Court to impose a significant sentence. Defendant's fraudulent conduct at Wells Fargo caused tens of millions of dollars in investor losses. Now, what makes Defendant's such an aggravated case is his return to crime—bank fraud, no less—in the face of adversity. For all these reasons, and under the factors cited below, a mid-Guidelines sentence is appropriate.

**A.     The nature and circumstances of the offenses. See 18 U.S.C. § 3553(a)(1).**

### The Ponzi Scheme Case

As noted, the nature and circumstances of Defendant's 2015 conduct demand a significant term of imprisonment. The Ponzi scheme at issue in the first case resulted in at least

**$69,000,000.00** in fraud proceeds that went directly to the conspirators (see McConley Plea Agreement [ECF No. 49] at ¶ 14; PSI ¶ 61). Part of that money was spent on various investment properties purchased by this Defendant (see PSI ¶ 6; Def. Factual Basis at ¶¶ 13, 16). And there is no dispute that dozens of victim investors, including novice filmmakers, lost every cent (see PSI ¶¶ 60-72, 90-92, 100). The victims lost not just their investments, but their reputations. According to one victim, the stress of being defrauded actually caused a beloved business partner's death (PSI ¶ 92). As Defendant himself described the scheme,

> **I am disgusted by what I was a part of. It is sickening to know this happened to people.**

(PSI ¶ 95) (emphasis added).

The Government previously acknowledged and maintains that Defendant was the least culpable charged participant in the Ponzi scheme (see PSI Add. at 5).[3] He was recruited by McConley and directed primarily by Van Eman (see Def. Factual Basis at ¶¶ 12-13). His decision to commit more fraud years later does not change that. But Defendant's request for a reduction **beyond** the four-level departure already included in the Government's recommendation is simply overreaching.

First, Defendant's involvement in the Ponzi scheme did not end with his termination in June 2015. As he already admitted at his change-of-plea hearing,

> [f]ollowing his termination from Wells Fargo Bank in June 2015, the defendant, co-defendant Benjamin McConley, and co-defendant Jason Van Eman repeatedly lied to victims by assuring them that the defendant was still a bank employee. These false assurances were often accompanied by fraudulent Wells Fargo Bank letters, signed by the defendant, which falsely assured the victims that their funds had been

---

[3] The Probation Office disagrees, noting that Defendant never withdrew from the conspiracy, even after he was fired from the bank, and directly caused roughly half of the losses in that case (PSI Add. at 4-5).

matched and were held in secure accounts at Wells Fargo Bank. **<u>The defendant transmitted several of these letters following his termination from Wells Fargo bank in June 2015</u>**.

(Def. Factual Basis at ¶ 15) (emphasis added). As noted, Defendant was still signing bogus bank letters in October 2015, including a letter lulling the victims who lost $28.6 million dollars in the scheme (PSI at 21; PSI Add. at 4). And the fact that "he could no longer send official Wells Fargo emails" did not deter him (Def. Mem. at 6). In fact, the indictment charges a number of wire fraud counts based on e-mails sent to and from Defendant's personal "AOL" account. (See PSI ¶ 41) ("At the direction of Van Eman, Rafael continued to send deceptive and fraudulent emails to victims from his personal email account"). Finally, Defendant remains affiliated with Capital B LLC to this day (PSI Add. at 4). In fact, he falsely applied for COVID-19 loans for Capital B LLC (PSI, Case No. 21-20161, ¶ 7(b)-(c)). That same company, as he previously admitted, "was funded with [Ponzi] victims' monies and further used to purchase, among others, stocks, and real estate investment properties, with victims' funds." (PSI ¶ 40).

Second, although he pocketed around $65,000 in corrupt payments from McConley (which were disguised as "consulting fees"), Defendant made far more as a result of his involvement in the Ponzi scheme. Some of these proceeds, including his investment property in Tallahassee, Florida, will be forfeited (PSI ¶ 6). Others, including additional investment properties, profits generated therefrom, the private flights to Las Vegas, and the tens of thousands Defendant paid to American Express to cover his personal spending, will not (PSI ¶ 40). These fraudulently obtained benefits, which he lied about during pre-indictment interviews with the FBI, were one of the many reasons Defendant was ultimately charged (see PSI ¶ 54). To be clear, Defendant did not "immediately accept" responsibility (Def. Mem. at 3). Instead, he denied his involvement and

misled the FBI and prosecutors during pre-indictment interviews in 2017 (PSI ¶¶ 50-59). At times, it appears that Defendant still does not understand or appreciate the seriousness of his conduct. For example, in explaining his decision to submit the six (6) fraudulent loan applications, Defendant claims he "was bombarded by bank representatives inviting him to apply for PPP/EIDL relief" (Def. Mem. at 10). (See also Def. Supp. PSI Obj. at 2) ("we will not be asking for a probationary sentence in light of the second case as we had intended to do").

Third, the loss amount in this Ponzi scheme case does not "greatly" overstate the seriousness of the offense (or Defendant's involvement) (see Def. Mem. at 8). If anything, the loss amount in the PSI, $25 to $65 million, understates the losses caused by Defendant and his co-schemers. For example, McConley has already agreed to forfeit $69 million in directly traceable fraud proceeds (McConley Plea Agreement at ¶ 14). But those numbers continue to mount. To date, the Government has interviewed approximately 30 investors who wired over $81 million to accounts under the schemers' (primarily McConley's) control. Not once did the conspirators actually use those funds to secure lines of credit at the banks—something Defendant assured investors they did (Def. Factual Basis at ¶ 12).

Additionally, as noted, Defendant communicated directly with a number of these victims during the first half of 2015. Several are identified in the indictment by their initials (see PSI at 18-21). Together, those victims invested over $32 million. As the Probation Officer notes, that is almost half of the total loss generated by this years-long fraud (PSI Add. at 4). Additionally, based only on the Government's interviews with victim investors who ultimately sent monies to McConley/Van Eman, Defendant dealt (directly and indirectly) with approximately ten (10) of them. That is a substantial portion of the confirmed victims in the case, and happened to include

the group of investors that suffered the largest financial loss. Even if Defendant had not been directly involved in defrauding these investors, it is well-established that participants in a conspiracy may be held responsible for losses resulting from the reasonably foreseeable acts of co-conspirators in furtherance of the conspiracy. United States v. Hunter, 323 F.3d 1314, 1319 (11th Cir. 2003); U.S.S.G. § 1B1.3(a)(1)(B).

Simply put, both the Guidelines range and the loss amount driving it accurately reflect Defendant's culpability and the seriousness of this offense. In fact, if the Court elects to follow the Government's recommendation, Defendant will be the rare defendant sentenced as a "minimal" participant, a category "intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group." U.S.S.G. § 3B1.2, App. N. 4. That is a substantial concession. Defendant deserves no additional breaks.

## **The Bank Fraud Case**

The circumstances of Defendant's COVID-19 loan fraud are egregious. He lied to banks about his prior crime—while on bond awaiting sentencing for that crime. He did it six different times (see PSI, Case No. 21-20161 [ECF No. 25] at ¶ 20). As a former bank employee, he understood perfectly well that telling the truth about his criminal history would make it impossible to secure loans intended for legitimate businesses suffering during the pandemic. That Defendant twice attempted to obtain Government-backed loans on behalf of Capital B LLC, his joint venture with McConley, is galling (id.).

Despite all this, he has remained at liberty. The time has come for him to be held accountable. The most obvious way to achieve this is to run a portion of the bank fraud sentence consecutive to his sentence in the Ponzi scheme case. As noted, the Government recommends at

least six months be run consecutive, which would ensure some modicum of additional punishment for the new offense. See 18 U.S.C. § 3147 ("A person convicted of an offense committed while released under this chapter shall be sentenced, in addition to the sentence prescribed for the offense, to—(1) a term of imprisonment of not more than ten years if the offense is a felony; . . . **A term of imprisonment imposed under this section shall be consecutive to any other sentence of imprisonment**.") (emphasis added). In short, Defendant cannot reasonably say that, given the circumstances of his latest offense, his advisory Guidelines range of 18-24 months (or 21-27 months) is too high.

    **B.**   **The history and characteristics of the Defendant. See 18 U.S.C. § 3553(a)(1).**

With respect to Defendant's history and characteristics, he is not "a 31-year-old first-time, non-violent offender, who has otherwise led an exemplary life." (Def. Mem. at 3). In fact, he is a recidivist. He committed two distinct Federal fraud crimes, some five years apart. Despite this, he may not receive **any** enhancement based on his criminal history (see PSI, Case No. 21-20161 [ECF No. 25] at ¶ 39). What is perhaps more important is that, in the five years separating his first fraud from his latest, he has failed to make amends. As noted, in 2017 Defendant was offered an opportunity to cooperate under the protection of a limited-use immunity letter and with the benefit of counsel; he denied any involvement in the Ponzi scheme and refused to tell the truth (PSI ¶¶ 50-59). Following his indictment, arrest, and guilty plea, Defendant was given yet another opportunity to cooperate (while free on bond). According to his Sentencing Memorandum, he had the support of his family and a healthy newborn child (see Def. Mem. at 20). He also had the possibility of a significantly reduced sentence and a chance to move on with his life. In the end,

he squandered it—for $29,000 in COVID-19 loans. Defendant, who lives in a $500,000 home in his wife's name (PSI ¶ 48), should have to answer for that.

It is also notable that, of the numerous letters submitted by his friends and family, none directly addresses his second conviction for lying to obtain COVID-19 loans. This is not surprising. After all, one cannot blame Defendant's recent loan fraud on his co-conspirators. Accordingly, the letters that attribute his predicament to "choices based on trust, and the goodness of others" (see Def. Letters [ECF No. 132-1] at 2) or because he "is trusting to a fault" (id. at 20), ring hollow at this stage.

> **C.    The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; general deterrence; and specific deterrence. See 18 U.S.C. § 3553(a)(2)(A), (B), (C).**

Defendant rightfully concedes his participation in "an enormous fraud" (Def. Mem. at 1). In these types of cases, where the defendants are lawyers, bankers, or investment advisers, courts acknowledge "the critical deterrent value of imprisoning serious white collar criminals, **even where those criminals might themselves be unlikely to commit another offense**[.]" Martin, 455 F.3d at 1240 (citation omitted; emphasis added). In that sense at least, this is an unusual case. In 2015, Defendant was the "inside man" for an elaborate, sophisticated Ponzi scheme. Despite his termination, prosecution, and subsequent apologies to the Court (PSI ¶ 95), he quickly committed another fraud offense (about five months after his guilty plea, while he was supposed to be cooperating with the Government). Accordingly, it is difficult to accept at face value Defendant's claim that he "will never do such a thing again" (PSI, Case No. 21-20161 [ECF No. 25] at ¶ 25). What is clear, however, is that the mere **prospect** of prison is not enough to deter him. See 18 U.S.C. § 3553(a)(2)(C) (addressing specific deterrence). Although the Government typically

focuses, as the courts do, on general deterrence in white-collar cases, there is an obvious need to prevent this Defendant from continuing to harm people through his crimes. The Ponzi scheme victims' impact statements make that plain (see PSI ¶¶ 90-92).

Of course, a long sentence in this case will also send a strong message, not only to junior employees who might be corrupted by wealth and influence, but to run-of-the-mill fraudsters who believe that failing to "check a box" on a Government loan application is no big deal. Defendant was both. Once a Wells Fargo personal banker with a sideline in real estate investment, he understood the business of assessing risk and making cost-benefit calculations (PSI ¶¶ 37, 40). Ultimately, he chose enrichment for himself and his co-conspirators at the expense of the investors who believed him. And even with the prospect of prison looming, Defendant elected, at the height of the pandemic and as the "primary caregiver" for his infant son, to commit loan fraud.

And while it is unlikely that many entry-level bankers will be presented with an opportunity to help steal tens of millions of dollars from aspiring filmmakers, the second fact pattern has become all too common. As evidenced by his experience as a banker (and his admitted criminal intent), Defendant's decision to conceal his criminal history on loan applications was not a mistake. Not the first time. Certainly not the sixth time. Because of the prevalence of COVID-19 fraud, a severe sentence will force individuals into a more difficult cost-benefit analysis; where the threat of imprisonment must be weighed against the seemingly "free" money being advanced by the Government to help people struggling through "economic hardship stemming from a global pandemic" (Def. Mem. at 19).

    **D.**    **The applicable Sentencing Guidelines and unwarranted disparities. See 18 U.S.C. § 3553(a)(4), (6).**

The rationale and validity of the fraud Guidelines are addressed above. Notably, there are no disputes in this case about the loss amount or the number of victims, or the sophisticated manner and means. Moreover, the Court can address any potential disparities between Defendant and his co-conspirators by adopting the parties' joint recommendation with respect to his minimal role. But additional leniency, whether under the guise of a "departure" (Def. Mem. at 8), or a variance (id. at 4), is unwarranted.

Nor should the Court accept Defendant's invitation to compare apples and oranges. On the surface, his Sentencing Memorandum cites a series of similar cases where local bankers helped an infamous Ponzi schemer defraud investors (Def. Mem. at 11-12). But those defendants did not continue committing crimes post-plea, as this Defendant did. Nor did they jeopardize their status as cooperators, as this Defendant did. On the contrary, both Spinosa and Szafranksi were afforded the opportunity to plead to superseding informations charging them with lesser, five-year offenses (18 U.S.C. § 371), and Szafranksi cooperated extensively pre-indictment—something this Defendant refused to do. See United States v. Szafranski, Case No. 15-6001-CR-Dimitrouleas, Joint Motion for Reduction of Sentence ([ECF No. 67]) (S.D. Fla. March 16, 2016). In fact, according to his Sentencing Memorandum, Szafranski paid full restitution of $6.5 million (or 90% of his family's assets) to his victims. Id., Sent. Mem. ([ECF No. 60] at 2) (S.D. Fla. Oct. 20, 2015). That type of contrition, in word or deed, is conspicuously absent from Defendant Benjamin Rafael's written submission.

## **CONCLUSION**

Defendant received chance after chance to atone for his fraudulent conduct in 2015. He squandered those chances. This time, he cannot point the finger at his co-conspirators. In sum, Defendant does not deserve a below-Guidelines sentence absent substantial assistance which, to

date, he has not provided. He certainly does not deserve the extraordinary leniency sought by his counsel. Instead, the Court should deny Defendant's motions for a downward departure and downward variance, and impose a mid-Guidelines sentence.

> Respectfully submitted,
>
> JUAN ANTONIO GONZALEZ
> ACTING UNITED STATES ATTORNEY

By: /s/ *Christopher Browne*
Assistant United States Attorney
Christopher Browne
FL Bar No. 91337
Elizabeth Young
Court ID No. A5501858
U.S. Attorney's Office
Southern District of Florida
99 N.E. 4th Street, Suite 400
Miami, FL 33132-2111
Telephone: 305-961-9419
E-mail: christopher.browne@usdoj.gov

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on July 11, 2021, the foregoing document was filed with the Clerk of the Court using CM/ECF.

/s/ *Christopher Browne*
Assistant United States Attorney